UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RANDY SWINSON,

                                  Plaintiff,

                         -v.-

THE CITY OF NEW YORK, SHERMA DUNBAR,
ASSISTANT DEPUTY WARDEN ELYN RIVERA,
and CAPTAIN JOHN HERNANDEZ,

                                  Defendants.

---

19 Civ. 11919 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Randy Swinson brings this civil rights action under 42 U.S.C. § 1983 against Defendant The City of New York (the "City") and several of its employees (collectively, "Defendants"), asserting constitutional claims that arise from events that occurred while he was detained at the Manhattan Detention Complex ("MDC") and, later, at the George R. Vierno Center on Rikers Island ("GRVC"). In brief, Plaintiff claims that: (i) his rights to privacy concerning medical and mental health information were infringed; (ii) prison officers were deliberately indifferent to his medical needs; (iii) certain other conditions of his confinement were unconstitutional; and (iv) he was retaliated against for filing prison grievance forms and initiating the instant case.

Since commencing this lawsuit in December 2019, Plaintiff has sought to amend his complaint several times. The operative complaint is the Third Amended Complaint (the "TAC"), filed on December 18, 2020. Defendants have moved to dismiss the TAC on various grounds; Plaintiff has not opposed this motion, and indeed has offered to withdraw his claims without prejudice, but

Defendants seek to have Plaintiff's claims dismissed with prejudice.  For the reasons set forth in the remainder of this Opinion, the Court grants Defendants' motion insofar as it dismisses Plaintiff's federal claims with prejudice.

## BACKGROUND[1]

### A.    Factual Background

Plaintiff Randy Swinson is currently housed at GRVC, after being arrested in November 2021.  *See* N.Y.C. Dep't of Correction Inmate Lookup Service, https://a073-ils-web.nyc.gov/inmatelookup/pages/home/home.jsf

---

[1]    This Opinion draws its facts from the well-pleaded allegations of the TAC (Dkt. #37), which allegations the Court assumes to be true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also considers the exhibits attached to the TAC.  *See Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing materials that may properly be considered in resolving a motion to dismiss).

For ease of reference, the Court refers to Defendants' memorandum of law in support of its motion to dismiss the Complaint as "Def. Br." (Dkt. #46).  Other submissions in the case will be cited by docket entry number, and the Court's pinpoint citations to Plaintiff's submissions will refer to the page numbers assigned by this Court's electronic case filing ("ECF") system.

The underlying Complaint filed by Plaintiff on December 30, 2019, named as defendants the City, Elyn Rivera, and John Hernandez, along with several medical professionals and Correctional Health Services.  (Dkt. #2).  Summonses were issued for each defendant.  (Dkt. #6).  The First Amended Complaint, filed on September 9, 2020, provided additional information about a subset of these defendants, but did not appear to modify the claims asserted.  (Dkt. #26).  The Second Amended Complaint, filed on November 17, 2020, but later stricken from the record, named as defendants the City (naming specifically then-Mayor DeBlasio), Hazel Jennings, Sherma Dunbar, and Jennifer Cottman.  (Dkt. #33).  The operative TAC names as defendants in the case caption the City, Sherma Dunbar, Elyn Rivera, and John Hernandez, and names as defendants in the section captioned "Defendant Information" these four Defendants and Hazel Jennings.  (TAC 1, 3).  However, the body of the TAC appears to also name as defendants prison physician assistants Ira Gornish and Bessie Flores-Clemente.  For avoidance of doubt, defense counsel has confirmed that the Law Department of the City of New York represents, and has filed the instant motion on behalf of, "all Defendants named or referenced in the TAC." (Dkt. #52).  The Court therefore refers collectively to the City and the six individual defendants named or referenced in the TAC as "Defendants."  Given the disposition of this motion, the Court will not amend the caption further.

(last accessed Jan. 14, 2022).  Plaintiff alleges that during the relevant time period, Defendant Hazel Jennings was the Chief of the New York City Department of Correction (the "DOC"); Defendant Sherma Dunbar was the Warden of both MDC and GRVC; Defendant Elyn Rivera was a correction officer and Deputy Warden; Defendant John Hernandez was a captain and correction officer; and Defendants Ira Gornish and Bessie Flores-Clemente were MDC physician assistants.  (TAC 4-6).

In November 2019, Plaintiff was housed in a lockdown unit, Unit 9 North, at MDC in lower Manhattan.  (TAC 7).  During his time in Unit 9 North, Plaintiff claims that his privacy rights were violated and that prison personnel acted with deliberate indifference to his medical needs.  In particular, Plaintiff claims that during sick-call rounds, medical professionals examined Plaintiff through his cell door and asked him questions about his medical and mental health conditions within earshot of correction officers and other detainees in the unit, instead of taking him to the facility clinic or to a separate triage area on the ninth floor.  (*Id.*).  Though Plaintiff claims to have filed several grievances related to the matter, the situation did not improve.  (*Id.*).  Plaintiff came to learn that prison medical professionals were acting pursuant to a Command Level Order (the "MDC CLO") approved by Warden Dunbar and reviewed by Deputy Warden Rivera, which order implemented numerous restrictions on inmates housed in lockdown areas at MDC.  (*Id.*; *id.* at Ex. A-B).  Plaintiff contends that certain medical and other restrictions in the MDC CLO fall below the Minimum Standards adopted by the New York City Board of

Correction (the "BOC"), and for this reason are unconstitutional. (*Id.* at 7-9). *See* https://www1.nyc.gov/site/boc/jail-regulations/minimum-standards.page (last accessed Jan. 14, 2022).

Plaintiff further claims that "Defendant" (he does not specify which) "showed deliberate indifference to the medical needs of the Plaintiff, and particularly neglected those of others at '9 North.'" (TAC 8). Plaintiff also claims more broadly that medical care was "inadequate" and that "[d]eficiencies were the norm," citing, among other things, his inability to obtain examinations or care upon request, as well as once-weekly, instead of once-daily, sick calls. (*Id.*). Plaintiff further complains about other conditions of his confinement, including the failure of prison officials to answer his grievances or to forward them to the Central Office Review Committee ("CORC"); the loss of or tampering with his mail; the delivery of mail by security personnel rather than mailroom personnel; what he refers to as "no grooming"; the insufficient provision of undergarments; and the failure to provide access to legal research. (*Id.* at 9-10).

Plaintiff also claims to have been retaliated against for filing grievances and for filing the instant litigation. (TAC 8-9). In November 2020, Plaintiff was transferred from MDC to GRVC. (*Id.* at 9). According to Plaintiff, Defendant Dunbar modified the relevant CLO regarding lockdown conditions at GRVC (the "GRVC CLO") at or near the time of his transfer so that it was as restrictive as the MDC CLO, and so that "currently there [are] no services, sick call or medical privacy and confidentiality." (*Id.*). Plaintiff further alleges that

Defendants retaliated against him by listing him as a suspected gang member, though he quickly resolved the matter after filing a grievance. (*Id.* at Ex. D). Plaintiff further alleges that, within a week of his arrival at GRVC, Defendants stopped his mail service, his visits with family, and his ability to participate in religious observances. (*Id.* at 9-10). And at the end of the TAC, Plaintiff lists various items and services of which he has been deprived while at GRVC.

## B.    Procedural Background

Plaintiff filed a request for leave to proceed *in forma pauperis* ("IFP") and a complaint on December 30, 2019. (Dkt. #1-2). The Court granted his IFP application on January 23, 2020 (Dkt. #4), and issued an order of service on February 3, 2020 (Dkt. #6). The Court scheduled an initial pretrial conference in the matter (Dkt. #8), and the defendants then named in the complaint indicated their intention to file a motion to dismiss (Dkt. #20-21). A pre-motion conference was held on July 24, 2020, during which Plaintiff was given an opportunity to file an amended complaint on or before October 30, 2020. (*See* Dkt. #22 (transcript of conference of July 24, 2020)).

Plaintiff filed his First Amended Complaint on September 29, 2020. (Dkt. #26-27). The defendants named in that complaint again indicated their intent to move to dismiss, and the Court scheduled briefing for that motion. (Dkt. #28-29). Those defendants filed a motion to dismiss on November 9, 2020 (Dkt. #30-32), but Plaintiff responded by filing a Second Amended Complaint that was stricken from the docket (Dkt. #33). By Order dated November 20,

2020, the Court granted Plaintiff a final opportunity to amend his pleadings and denied the pending motion to dismiss as moot.  (Dkt. #36).

Plaintiff filed the TAC on December 18, 2020.  (Dkt. #37).  Defendants indicated their intention to move to dismiss, and the Court scheduled briefing on the motion by memo endorsement dated February 1, 2021.  (Dkt. #38-39).  After obtaining several extensions, Defendants filed their motion to dismiss on March 5, 2021.  (Dkt. #45-47).  In response, Plaintiff filed a letter on April 30, 2021, requesting that the matter be dismissed without prejudice so that it could be consolidated into a separate state court action that Plaintiff had filed.  (Dkt. #48).  Defendants objected to dismissal of the case without prejudice, and the Court consequently denied Plaintiff's request while scheduling an extended period of time within which he could file an opposition to Defendants' motion.  (Dkt. #51).  No opposition has been received, and the Court considers briefing on the motion to be complete.

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

"[A]lthough a party is of course to be given a reasonable opportunity to respond to an opponent's motion, the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law."  *McCall* v. *Pataki*, 232 F.3d 321, 322-23 (2d Cir. 2000).  Accordingly, "the plaintiff's failure to respond to a Rule 12(b)(6) motion does not [itself] warrant dismissal," and the district court must

6

determine whether dismissal of the complaint is appropriate on the merits.  *Id.* at 323.

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  The Court is tasked with applying the same standard irrespective of whether a motion to dismiss is unopposed.  *See Haas* v. *Com. Bank*, 497 F. Supp. 2d 563, 564 (S.D.N.Y. 2007) ("In deciding an unopposed motion to dismiss, a court is to assume the truth of a pleading's factual allegations and test only its legal sufficiency[.]" (internal quotation marks omitted) (quoting *McCall*, 232 F.3d at 322)).  While the plausibility requirement "is not akin to a 'probability requirement' … it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  Toward that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials."  *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  This narrow universe includes "facts stated on the face of the

complaint, ... documents appended to the complaint or incorporated in the complaint by reference, and ... matters of which judicial notice may be taken," as well as documents that can properly be considered "integral" to the complaint. *Id.* (internal citation omitted). In resolving the instant motion, the Court considers both the TAC and its exhibits.

"[C]ourts must construe *pro se* pleadings broadly, and interpret them 'to raise the strongest arguments that they suggest.'" *Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (quoting *Graham* v. *Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)). "However inartfully pleaded, a *pro se* complaint may not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Legeno* v. *Corcoran Grp.*, 308 F. App'x 495, 496 (2d Cir. 2009) (summary order) (internal quotation marks and alterations omitted) (quoting *Posr* v. *Ct. Officer Shield No. 207*, 180 F.3d 409, 413 (2d Cir. 1999)). "That said, the liberal pleading standard accorded to *pro se* litigants is not without limits, and all normal rules of pleading are not absolutely suspended." *Hill* v. *City of New York*, No. 13 Civ. 8901 (KPF), 2015 WL 246359, at *2 (S.D.N.Y. Jan. 20, 2015) (internal quotation marks and citation omitted). To survive a Rule 12(b)(6) motion to dismiss, a *pro se* plaintiff's factual allegations still must at least "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And even in the *pro se* context, the court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual

conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)).

### 2.      Civil Rights Actions Under 42 U.S.C. § 1983

"[42 U.S.C. § 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City* v. *Tuttle*, 471 U.S. 808, 816 (1985).  There are two essential elements to any claim raised under Section 1983: "[i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis* v. *Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

The Court first outlines the pleading requirements for Plaintiff's claims against the individual Defendants.  "To establish a [Section] 1983 claim, a plaintiff must show the defendants' personal involvement in the alleged constitutional violation." *Boley* v. *Durets*, 687 F. App'x 40, 41 (2d Cir. 2017) (summary order) (citing *Wright* v. *Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Failing to allege that a defendant was personally involved in, or responsible for, the conduct complained of renders a complaint "fatally defective on its face." *Alfaro Motors, Inc.* v. *Ward*, 814 F.2d 883, 886 (2d Cir. 1987) (internal quotation marks omitted).  Conversely, "group pleading," which "fail[s] to differentiate as to which defendant was involved in the alleged unlawful conduct," is insufficient to state a claim under Section 1983.  *Myers* v. *Moore*, 326 F.R.D. 50, 60 (S.D.N.Y. 2018).  To satisfy Rule 12(b)(6), a plaintiff must

make "specific factual allegations" against each defendant.  *Thomas* v. *Venditto*, 925 F. Supp. 2d 352, 363 (E.D.N.Y. 2013).

The fact that a defendant is a supervisor does not suffice under Section 1983 to impute personal involvement to that person; instead, liability requires that the "defendant, through the official's own individual actions, has violated the Constitution." *Tangreti* v. *Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).[2]  Indeed, "a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Id.* at 620.  In other words, an individual defendant may not be held liable under Section 1983 merely because that defendant employs or supervises a person who violated the plaintiff's rights.

Stating a Section 1983 claim against a municipal entity, such as the City, requires additional pleading.  "[M]unicipalities may be sued directly under [Section] 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision."

---

[2]  In so holding, *Tangreti* recognized the abrogation, at least in part, of the prior five-factor test for supervisory liability set forth in *Colon* v. *Coughlin,* by which "personal involvement" was determined by considering whether:

> [i] the defendant participated directly in the alleged constitutional violation, [ii] the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, [iii] the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, [iv] the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or [v] the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d 865, 873 (2d Cir. 1995) (citations omitted).

*Batista* v. *Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (citing *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)).  Under *Monell* and its progeny, municipalities are not subject to liability for Section 1983 claims under a theory of *respondeat superior*, but rather on the basis that their policies or customs inflicted the alleged injuries.  *Id.*

To hold a municipality liable under Section 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (i) the existence of an official policy or custom that (ii) causes the plaintiff to be subjected to (iii) a denial of a constitutional right.  *Batista*, 702 F.2d at 397; *accord Torcivia* v. *Suffolk Cnty., New York*, 17 F.4th 342, 354 (2d Cir. 2021).   The plaintiff may show the existence of such a policy or custom by identifying any of the following: (i) an express policy or custom; (ii) an authorization of a policymaker of the unconstitutional practice; (iii) failure of the municipality to train its employees, which exhibits a "deliberate indifference" to the rights of its citizens; or (iv) a practice of the municipal employees that is "so permanent and well settled as to imply the constructive acquiescence of senior policymaking officials."  *Corley* v. *Vance*, 365 F. Supp. 3d 407, 438 (S.D.N.Y. 2019), *aff'd sub nom. Corley* v. *Wittner*, 811 F. App'x 62 (2d Cir. 2020) (summary order); *see also Outlaw* v. *City of Hartford*, 884 F.3d 351, 372-73 (2d Cir. 2018) (discussing what constitutes official municipal policy and deliberate indifference).

B.    **Analysis**

1.    **Plaintiff's Allegations Against Each Defendant**

As just noted, a plaintiff alleging a Section 1983 claim must identify the ostensibly violative conduct of each defendant.  In the instant case, Plaintiff weaves individualized allegations with group pleading of violations.  The Court has read his pleadings liberally, and understands the conduct attributable to each Defendant to be as follows:

The City of New York is alleged to have, through its agents, "operated, maintained and controlled the New York City Department of Correction[], including all the correction officers thereof."  (TAC 4).  The Court understands Plaintiff to be ascribing responsibility to the City for unconstitutional acts stemming from the implementation of CLOs that departed from the BOC's Minimum Standards, and from the conduct of its employees and agents.

Hazel Jennings is alleged to have served as the Chief of the New York City Department of Correction during the relevant time period.  (TAC 4).  No other conduct is attributed to her in the TAC.  For this reason, all claims against her are dismissed.  *See Tangreti*, 983 F.3d at 621.

Sherma Dunbar is alleged to have served as the Warden of both MDC and GRVC during the relevant time period.  (TAC 4-5).  Plaintiff alleges that Defendant Dunbar violated his rights by issuing two CLOs, the first of which addressed conditions in lockdown units at MDC and the second of which addressed conditions in lockdown units in GRVC.  (*Id.* at 5; *id.* at Ex. A-B).  According to the TAC, the MDC CLO violated Plaintiff's constitutional rights "by

12

denying or eliminating the Plaintiff's minimum standards and health care/mental health minimum standards." (*Id.* at 7).  Plaintiff further alleges that immediately after he began filing grievances against Dunbar and the other Defendants, "all services this Plaintiff and other 9 North residents [were] entitled to by Minimum Standards Policy were taken away by" the MDC CLO. (*Id.* at 8-9).  Similarly, Dunbar "changed" the CLO after Plaintiff was transferred to GRVC.  (*Id.* at 9).[3]  As a result, "now currently there are no services, sick call, or medical privacy and confidentiality" at GRVC.  (*Id.*).

Elyn Rivera is alleged to have served as a correction officer and Deputy Warden during the relevant time period.  (TAC 5).  Though Plaintiff attributes no specific actions to Rivera in the TAC, Exhibit A to the TAC indicates that Rivera approved the MDC CLO in her concurrent capacities as Deputy Warden for Security and Deputy Warden for Programs.  (*Id.* at Ex. A).

John Hernandez is identified in the TAC as a "Correction Officer Captain" at MDC.  (TAC 5).  The only conduct attributed to him is Plaintiff's allegation that "mail was being lost or tampered with and delivered by Capt. John Hernandez and security team instead of mailroom officers."  (*Id.* at 9).[4]

---

[3]     Plaintiff suggests that the GRVC CLO supplanted the MDC CLO, and, further, that the change in CLOs was concurrent with (and related to) his transfer to GRVC.  (TAC 9; *id.* at Ex. A-B).  His own exhibits undermine this argument.  The two CLOs address different subject matters, with the first, effective as of April 12, 2019, pertaining to lockdown conditions at MDC (where Dunbar was then Acting Warden), and the second, effective as of November 2, 2020, pertaining to lockdown conditions at GRVC (where Dunbar was then Warden).  There is nothing in the CLOs or in Plaintiff's pleading to suggest that the restrictions were specific to or influenced by any conduct of Plaintiff.

[4]     In the underlying complaint, Plaintiff alleged that Hernandez was the security captain in charge of the unit in which Plaintiff was housed at MDC.  (Dkt. #2 at 7).  Plaintiff suggested in that complaint that Hernandez was liable for failing to train staff properly

Ira Gornish and Bessie Flores-Clemente are alleged to have served as physician assistants at MDC.  (TAC 6-7).  Each is alleged to have responded to one or more requests for medical attention from Plaintiff by providing care at Plaintiff's cell door, without opening the cell and taking Plaintiff to a more private area.  In addition, each is alleged to have asked Plaintiff for background and other information while correction officers and other detainees were present.

### 2.    Plaintiff Has Not Alleged a Violation of His Right to Privacy

Plaintiff first claims that his right to privacy regarding his medical and mental health issues was violated when medical professionals at MDC conducted sick calls at Plaintiff's cell door rather than a more private area, and when these same professionals asked Plaintiff questions about medical and mental health issues within earshot of correction officers and other inmates. (TAC 7).  These claims would appear to pertain to the specific actions of Defendants Gornish and Flores-Clemente, and might extend to the making and implementing of the MDC CLO by Defendants Dunbar and Rivera.  *Cf. Stone #1* v. *Annucci*, No. 20 Civ. 1326 (RA), 2021 WL 4463033, at *8 (S.D.N.Y. Sept. 28, 2021) ("Although the Second Circuit generally rejected *Colon*, *Tangreti* does not suggest that *Colon*'s third factor — whereby a defendant can be said to be personally involved in a constitutional violation if he 'created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of

_____

on issues of "care[,] custody[,] and control" (*id.*), though such claims are not repeated in the TAC and are not considered in this Opinion.

such a policy or custom,' — could never form the basis of an official's liability."
(internal citation omitted)).  Defendants respond that none of Plaintiff's
allegations concerning medical or mental health treatment supports a claim for
constitutional violations.  (Def. Br. 5-8).

The Due Process Clause of the Fourteenth Amendment protects an
inmate's right to the confidentiality of medical information for certain medical
conditions.  *See Powell* v. *Schriver*, 175 F.3d 107, 111-12 (2d Cir. 1999); *see
also Matson* v. *Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 63-64
(2d Cir. 2011) (characterizing the constitutional right to privacy as a right to
confidentiality, which includes a right to protection regarding information
about the state of one's health).  Those medical conditions entitled to
confidentiality are conditions that are (i) "excruciatingly private and intimate
[in] nature" and (ii) "likely to provoke both an intense desire to preserve one's
medical confidentiality, as well as hostility and intolerance from others."
*Matson*, 631 F.3d at 64 (citations omitted).  Courts have found that the right to
confidentiality of medical information extends to medical conditions like HIV,
transsexualism, and sickle cell anemia.  *See Powell*, 175 F.3d at 112
(transsexualism); *Doe* v. *City of New York*, 15 F.3d 264, 267 (2d Cir. 1994)
(HIV); *Fleming* v. *State Univ. of New York*, 502 F. Supp. 2d 324, 343 (E.D.N.Y.
2007) (sickle cell anemia).  Conversely, courts in this Circuit have declined to
extend this privacy right to serious medical conditions that are *not* likely to
provoke hostility or intolerance.  *See, e.g., Matson*, 631 F.3d at 67-68 (declining
to extend right to privacy to fibromyalgia); *Dash* v. *Doe*, No. 19 Civ. 414 (GBD)

(JLC), 2020 WL 3057133, at *3 (S.D.N.Y. June 9, 2020) (adopting Report and Recommendation that declined to extend right to privacy to bipolar condition, noting that "[s]everal courts in the Second Circuit have declined to expand this protection to cover the disclosure of mental health disorders" (collecting cases)); *Crosby* v. *Petermann*, No. 18 Civ. 9470 (JGK), 2020 WL 1434932, at *10 (S.D.N.Y. Mar. 24, 2020) (declining to extend right to privacy to hepatitis C); *Myers* v. *Dolac*, No. 09 Civ. 6642 (MWP), 2013 WL 5175588, at *7 (W.D.N.Y. Sept. 12, 2013) ("[C]ourts have declined to recognize constitutional protection for many other medical conditions, including fibromyalgia, arthritis and sleep apnea." (collecting cases)).  Even where an inmate holds a privacy right in maintaining the confidentiality of his medical information, prison officials can encroach on that right, but only to the extent that their actions are "reasonably related to legitimate penological interests."  *Powell*, 175 F.3d at 112 (quoting *Turner* v. *Safley*, 482 U.S. 78, 89 (1987)).

Plaintiff alleges that prison medical professionals discussed "background information" in front of other inmates and correction officers, while asking him questions about "prior drug use, HIV status, mental health, alcohol addiction, family's history of mental health, history, etc."  (TAC 7).  However, Plaintiff does not provide his answers to those questions, and the Court therefore cannot conclude that Plaintiff has alleged a privacy right in the confidentiality of any of the information he disclosed.  *Cf. Pisciotti* v. *Cnty. of Wayne*, 76 F. Supp. 2d 307, 310 (W.D.N.Y. 1999) ("Given the 'mundane' nature of the information, I find that whatever interest that plaintiff had in maintaining the secrecy of this

information was insufficient to give rise to a violation of his privacy rights."
(internal citation omitted)).

Even assuming that Plaintiff had adequately alleged such a privacy right,
the TAC discloses prison officials' legitimate penological interest in conducting
the medical examinations in the manner described by Plaintiff. Plaintiff alleges
that — while in lockdown status — he requested sick call services on several
occasions, which requests prompted visits from and discussions with medical
professionals. (TAC 7-8).[5] The MDC CLO stated that necessary medical or
mental health services would be provided in the housing area, and that
detainees in lockdown would not be moved to the clinic unless it was
"physically impossible to provide them with the necessary medical services in
the cell/housing area." (*Id.* at Ex. A at 4). To conduct medical visits in the
presence of other detainees and corrections officers is not, on the facts alleged,
a violation of Plaintiff's Fourteenth Amendment rights. *See Pena* v. *Downstate
Correctional Facility Med. Dep't*, No. 19 Civ. 7336 (LLS), 2020 WL 1467372, at
*3 (S.D.N.Y. Mar. 25, 2020) ("[T]he Constitution does not guarantee that a
medical examination of a prisoner must be conducted in private." (citation
omitted)); *Rodriguez* v. *Ames*, 287 F. Supp. 2d 213, 221 (W.D.N.Y. 2003)
("Prompt examinations of inmates in their cells [are] often the most practical
way to provide necessary treatment and to determine if in fact more extensive
examinations are needed in the infirmary or outside the institution."); *cf.*

---

[5]     Plaintiff does not contest his placement in a lockdown unit at either MDC or GRVC.
(*See generally* TAC).

*Michael* v. *Perez*, No. 16 Civ. 7850 (VB), 2017 WL 5991794, at *2 (S.D.N.Y. Dec. 1, 2017) ("The facts as alleged show [defendant] disclosed the medical information in the course of providing emergency medical treatment to an inmate, a legitimate penological interest.").  In this regard, it is significant to the Court that Plaintiff does not allege that the information he provided was shared gratuitously, or that prison medical professionals made light of his conditions, or that his answers prompted hostility on the part of prison staff or inmates.  *See Powell*, 175 F.3d at 112 ("[T]he gratuitous disclosure of an inmate's confidential medical information as humor or gossip ... is not reasonably related to a legitimate penological interest, and it therefore violates the inmate's constitutional right to privacy."); *Rodriguez*, 287 F. Supp. 2d at 220 ("In addition, where information about a particular condition spreads through 'humor or gossip,' it is more likely that the inmate's right to privacy has been violated." (citing *Powell*, 175 F.3d at 112)).  Accordingly, the Court dismisses Plaintiff's Section 1983 claim alleging a violation of his right to privacy.

### 3.    Plaintiff Has Not Alleged Deliberate Indifference to His Medical Needs

Separately, Plaintiff claims that prison officials at MDC were deliberately indifferent to his medical needs, as well as the needs of others housed in Unit 9 North.  (TAC 8).[6]  On this point, Plaintiff claims that medical care was

---

[6]    The Court considers only Plaintiff's allegations concerning his own treatment.  *Cf. Kelly* v. *Rockefeller*, 69 F. App'x 414, 416 (10th Cir. 2003) (unpublished order) ("A civil rights action must be based on the violation of plaintiff's personal rights, and not the rights of someone else." (internal quotation marks and citation omitted)).

"inadequate and [un]professional"; that medical records were not used in making diagnoses; that sick calls did not occur every day; and that he had to resort to extreme measures (including filing grievances and a civil action) to receive medical care.  (*Id.*).  As in the preceding section, the Court considers this claim to be brought against Defendants Gornish, Flores-Clemente, Dunbar, and Rivera.

Claims by pretrial detainees of unconstitutional conditions of confinement, such as inadequate medical care, are analyzed under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's Cruel and Unusual Punishment Clause.  *Darnell* v. *Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017); *see generally Gray* v. *Ramos*, No. 19 Civ. 3836 (KPF), 2021 WL 795166, at \*5-6 (S.D.N.Y. Mar. 2, 2021).  As a practical matter, however, "[a] detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'"  *Darnell*, 849 F.3d at 29 (quoting *City of Revere* v. *Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

A claim for inadequate medical care requires a showing of "deliberate indifference to ... serious medical needs," which in turn requires proof of two elements: "medical need" and "deliberate indifference."  *Smith* v. *Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element, "medical need," is objective, measuring "the severity of the alleged deprivation."  *Id.*  Courts assessing this objective prong "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause" the plaintiff. *Salahuddin* v. *Goord*, 467 F.3d 263, 280 (2d Cir. 2006).  Factors informing this

analysis include "[i] whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' [ii] whether the medical condition significantly affects daily activities, and [iii] 'the existence of chronic and substantial pain.'" *Brock* v. *Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (quoting *Chance* v. *Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).  In addition, "the actual medical consequences that flow from the alleged denial of care will be highly relevant[.]" *Smith*, 316 F.3d at 187; *see also Yancey* v. *Robertson*, 828 F. App'x 801, 803 (2d Cir. 2020) (summary order) ("For a constitutional violation to occur based on deliberate indifference to a prisoner's medical need, the deprivation of medical care must be 'sufficiently serious' in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists." (internal quotation marks omitted) (quoting *Hathaway* v. *Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996))).

The Second Circuit has clarified that the second element, "deliberate indifference," though often characterized as "subjective," is better understood as an element simply analyzing *mens rea* because it is "defined objectively." *Darnell*, 849 F.3d at 29, 35.  Indeed, this so-called subjective prong requires proof that the defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant[ ] knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35.  This standard therefore does not encompass "an inadvertent

failure to provide adequate medical care[.]"  *Estelle* v. *Gamble*, 429 U.S. 97, 105 (1976).

Once again, Plaintiff's conclusory pleadings are inadequate to state a claim under the Fourteenth Amendment.  To be clear, the Court is troubled by any allegation that sick call procedures were skipped, and it takes seriously Plaintiff's claim that he had to become the proverbial "squeaky wheel" to receive medical attention.  (*See* TAC 8).  That said, Plaintiff does not identify any medical issues that he experienced during the relevant time period, nor does he state a "sufficiently serious" deprivation of medical care.  Indeed, Plaintiff does not indicate how any such medical issues were exacerbated, or even affected, by the care that he received.  And while private examinations outside of his housing unit and more assiduous consultation of written medical records might constitute better practices, Plaintiff does not explain how any of the medical attention he received in lockdown status precipitated "the risk of serious damage to [his] 'physical and mental soundness.'"  *See Darnell*, 849 F.3d at 30.  Similarly, by employing the passive voice in his pleadings (*see e.g.*, TAC 8 ("Medical records vital in assessing a patient[']s potential for future sickness were not used to assist diagnoses.")), Plaintiff has failed to allege that any of the Defendants acted with the requisite knowledge or intent to satisfy the *mens rea* prong of the deliberate indifference analysis.  Accordingly, the

Court dismisses Plaintiff's claim for deliberate indifference to his medical needs.[7]

### 4. Plaintiff's Other Claims Regarding the Conditions of His Confinement Do Not State Constitutional Violations

The TAC, by its terms, recites two claims: "Count One: Medical and Mental Health Privacy and Confidentiality Violations" and "Count Two: Retaliatory Treatment for Filing Section 1983 Claim and for Filing Grievances." (TAC 7-8). However, sprinkled throughout the TAC are other allegations regarding Plaintiff's conditions of confinement at MDC and GRVC. The alleged deficiencies include, *inter alia*:

- Failure to answer grievances or to forward grievances to CORC (TAC 9);

- Loss of or tampering with mail (*id.*);

- Delivery of mail by security officers rather than mailroom staff (*id.*);

- "[S]topp[ing]" of mail, family visits, and religious services (*id.*);

- "[N]o grooming" (*id.* at 10);

- Plaintiff's placement in shackles (*id.*);

- The inability to attend religious services (*id.*);

- The inability to visit with family or make legal calls (*id.*);

- The lack of "social services" (*id.*);

- Insufficient undergarments (*id.*); and

---

[7]     Later in the TAC, Plaintiff alleges that after being designated a gang member at GRVC, he was placed in shackles and leg irons that "aggravated physical injuries." (TAC 10). Without pleading any detail concerning the injuries or the conduct, Plaintiff has failed to state a claim for deliberate indifference to his medical needs.

- Deficiencies in legal research (*id.*).

Many of the restrictions are required by the CLOs, and Plaintiff alleges that those restrictions depart from, or are violative of, the BOC's Minimum Standards. Even were that true, a defendant's violation of the Minimum Standards does not, standing alone, establish a violation of a federally guaranteed right for purposes of Section 1983. *See Knight* v. *Mun. Corp.*, No. 14 Civ. 3783 (PAE) (JCF), 2016 WL 4030632, at *6 n.7 (S.D.N.Y. July 26, 2016) (internal citations omitted); *accord, e.g.*, *Winters* v. *City of New York*, No. 19 Civ. 7271 (MKV), 2020 WL 4194633, at *5 (S.D.N.Y. July 21, 2020) (collecting cases); *Corley* v. *City of New York*, No. 14 Civ. 3202 (GHW), 2017 WL 4357662, at *10 (S.D.N.Y. Sept. 28, 2017) (collecting cases).

Mindful of the solicitude due the submissions of a *pro se* litigant, the Court will construe Plaintiff's objections to his conditions of confinement as standalone constitutional arguments. Caselaw in this area indicates that certain of the conditions alleged by Plaintiff could be pleaded to state a constitutional violation, while others could not. As relevant to Plaintiff's allegations, courts in this District have found that:

- Prison grievance procedures do not create a liberty interest subject to due process protection, *see George* v. *Cnty. of Westchester*, No. 20 Civ. 1723 (KMK), 2021 WL 4392485, at *4 (S.D.N.Y. Sept. 24, 2021) (collecting cases);

- Temporary deprivations of grooming and hygiene products fail to make out a Section 1983 claim, *see Little* v. *Mun. Corp.*, 51 F. Supp. 3d 473, 491-92 (S.D.N.Y. 2014) (collecting cases); and

- It is not "clearly established," for purposes of qualified immunity, that there is a constitutional right to visitation between inmates and family members, *see Miller* v. *Annucci*, No. 17 Civ. 4698 (KMK), 2019 WL 4688539, at *14 n.5 (S.D.N.Y. Sept. 26, 2019).

In contrast, there is caselaw suggesting that certain of Plaintiff's other objections to his conditions of confinement could form the basis of a constitutional violation. For instance, courts in the Second Circuit have found that an inmate may bring:

- First and Fourteenth Amendment claims for mail tampering if plaintiff can show (i) an ongoing practice of censorship unjustified by a substantial government interest, or (ii) that jail officials have unjustifiably chilled the prisoner's right of access to the court or impaired his legal representation, *see Davis* v. *Goord*, 320 F.3d 346, 351 (2d Cir. 2003);

- A claim for impairment of religious observances claims under the Free Exercise Clause of First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), *see McLeod* v. *Williams*, No. 18 Civ. 115 (RA), 2020 WL 2512164, at *3-4 (S.D.N.Y. May 15, 2020);

- A claim for denial of access to a law library, *see Rosado* v. *Maxymillian*, No. 20-3965-cv, 2022 WL 54181, at *1 (2d Cir. Jan. 6, 2022) (summary order); and

- A claim for denial of access to court, *see Perry* v. *Maloney*, No. 21 Civ. 8039 (LTS), 2021 WL 6127070, at *5 (S.D.N.Y. Dec. 27, 2021).

But even as to those allegations that *could* state a constitutional violation, Plaintiff's conclusory assertions and failure to plead necessary details result in a failure to state a claim. Accordingly, to the extent that Plaintiff seeks to plead separate Section 1983 claims relating to the conditions of his confinement, such claims are dismissed for failure to state a claim.

24

###### 5.     Plaintiff Has Failed to State a Claim for Retaliation

In Count Two, Plaintiff contends that his efforts to obtain redress for the conditions of his confinement at MDC — through the grievance process and through the instant lawsuit — led Defendants to retaliate against him.  (TAC 8-10).  Construing his claims liberally, the Court understands Plaintiff to allege that after being moved to GRVC in November 2020, he experienced similar problems with "no services, sick call or medical privacy and confidentiality." (*Id.* at 9).  Within a few days of his arrival at GRVC, Warden Dunbar had modified the CLO for lockdown units at GRVC so that it was similar to the MDC CLO; a few days after that modification, prison officials "stopped" Plaintiff's mail, family visits, and religious services.  (*Id.*).  Worse yet, Plaintiff was wrongly identified as a gang member, which resulted in further restrictions.  (*Id.* at 9-10).  Only after Plaintiff filed a grievance concerning the gang designation was it removed.  (*Id.* at 9; *id.* at Ex. D (Inmate Statement Form reflecting submission of grievance on November 12, 2020, along with Disposition Form reflecting December 1, 2020 proposal to resolve grievance by removing Plaintiff's gang member designation and December 10, 2020 acceptance of proposal by Plaintiff)).  Given the substance of Plaintiff's retaliation allegations, the only Defendant to whom they could pertain is Defendant Dunbar.[8]

---

[8]     Plaintiff suggests that Defendants Gornish and Flores-Clemente continued to follow the medical care protocols of the MDC CLO even after "several grievances and complaints" (TAC 7), but the Court does not believe Plaintiff to be making a retaliation claim about such conduct, nor does it find that their adherence to pre-existing directives occurred *because of* any protected conduct on Plaintiff's part.

"To prevail on a First Amendment retaliation claim, an inmate must establish [i] that the speech or conduct at issue was protected, [ii] that the defendant took adverse action against the plaintiff, and [iii] that there was a causal connection between the protected conduct and the adverse action." *Hayes* v. *Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (quoting *Holland* v. *Goord*, 758 F.3d 215, 225 (2d Cir. 2014)); *accord Espinal* v. *Goord*, 558 F.3d 119, 128 (2d Cir. 2009). "An inmate bears the burden of showing that 'the protected conduct was a substantial motivating factor in the prison official['s] disciplinary decision.'" *Holland*, 758 F.3d at 225-26 (quoting *Graham* v. *Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)); *see also Brandon* v. *Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) ("[M]ere negligence is not enough to support a claim of retaliation. A plaintiff must show some evidence of retaliatory intent to cause the adverse effect." (citation omitted)). If this showing is made, the defendant then bears the burden of establishing that the disciplinary action would have occurred "even absent the retaliatory motivation." *Holland*, 758 F.3d at 226 (alteration omitted) (quoting *Gayle* v. *Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)).

The Second Circuit has cautioned that "because we recognize both the near inevitability of actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care." *Hayes*, 976 F.3d at 272 (alteration and citation omitted). For this reason, First Amendment retaliation claims must be "supported by specific and detailed factual allegations" and may not be stated "in wholly conclusory terms." *Dolan*

26

v. *Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation omitted); *see also Graham*, 89 F.3d at 79 ("A complaint of retaliation that is wholly conclusory can be dismissed on the pleadings alone.").

Plaintiff's filing of grievances and of the instant litigation all qualify as "protected conduct" for retaliation purposes. *See Tirado* v. *Shutt*, No. 13 Civ. 2848 (LTS) (AJP), 2015 WL 774982, at *9 n.9 (S.D.N.Y. Feb. 23, 2015) (collecting cases), *report and recommendation adopted in part,* No. 13 Civ. 2848 (LTS) (AJP), 2015 WL 4476027 (S.D.N.Y. July 22, 2015).  Defendants argue, however, that Plaintiff has failed to demonstrate an adverse action, inasmuch as his erroneous designation as a gang member by prison officials was of limited duration and was corrected shortly after Plaintiff filed his grievance. (Def. Br. 11).  *See Davis*, 320 F.3d at 353 (distinguishing "retaliatory conduct that would deter a similarly situated individual of ordinary firmness" from *de minimis* conduct, and noting that only the former constitutes an adverse action).

The Court understands Plaintiff's retaliation claims to go beyond the gang designation incident, but concludes ultimately that none of the claims is adequately stated.  To begin, certain events outlined by Plaintiff in the TAC do not amount to adverse actions.  *First*, Warden Dunbar's modification of the GRVC CLO for lockdown units cannot be deemed to be an adverse action against Plaintiff, inasmuch as it pertained, by its terms, to all inmates at GRVC in court-ordered lockdown status.  In addition, as noted earlier, nothing in the TAC suggests that the modification was motivated by Plaintiff's conduct.

*Second*, Plaintiff's erroneous designation as a gang member does not constitute an adverse action because it was a *de minimis* error that was promptly corrected within two weeks of the processing of Plaintiff's grievance, and because there is no indication that Warden Dunbar was involved in the designation.  And while it is arguable that certain other events alleged by Plaintiff, such as the stoppage of mail and visits after November 11, 2020, *could* suffice as adverse actions, they do not suffice as pleaded because (i) they do not allege any conduct by Warden Dunbar, and (ii) certain restrictions on mail, visitation, religious services, and the like are expressly provided for in the GRVC CLO.  (*See* TAC, Ex. B).[9]

Even were the Court to find that Plaintiff had adequately pleaded one or more adverse actions, his retaliation claims would still fail because he fails to allege a causal connection between his protected conduct and any adverse action.  In order to show causation, Plaintiff's allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action."  *Diesel* v. *Town of Lewisboro*, 232 F.3d 92, 107 (2d Cir. 2000) (internal quotation marks and citation omitted).  Factors considered in evaluating whether causation existed include: (i) the temporal proximity of the protected conduct and the disciplinary action; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the

---

[9]     The Second Circuit has held that a prison transfer may constitute an adverse action. *See Davis* v. *Kelly*, 160 F.3d 917, 920 (2d Cir. 1998) (observing that "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights").  However, Plaintiff does not allege that his transfer to GRVC was retaliatory.

defendant regarding his motive for disciplining the plaintiff." *Colon* v. *Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995), *abrogated on other grounds by Tangreti*, 983 F.3d 609.  The Second Circuit has made clear that "temporal proximity alone ... is insufficient to establish a retaliation claim." *Ford* v. *Deacon*, 793 F. App'x 13, 16 (2d Cir. 2019) (summary order); *see also Vazquez* v. *City of New York*, No. 21 Civ. 1573 (PAE), 2021 WL 1966397, at *7 (S.D.N.Y. May 17, 2021) ("A plaintiff can establish a causal connection giving rise to an inference of retaliation, for example, by showing that the protected activity was 'very close' in time to the adverse action." (citing *Clark Cnty. Sch. Dist.* v. *Breeden*, 532 U.S. 268, 273-74 (2001); *Gayle* v. *Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002))).

Plaintiff offers nothing but temporal proximity, and even in this area he comes up short.  According to Plaintiff, the retaliatory conduct he experienced at GRVC was a consequence of his grievances and his federal complaint.  But the only grievances for which he provides dates are attached to his First and Third Amended Complaints.  Attached to the First Amended Complaint is a grievance form dated November 6, 2019, *i.e.*, some two years before the alleged retaliatory conduct.  (Dkt. #26 at 4).  Attached to the TAC is the grievance form dated November 12, 2020, which is one day *after* the "stopp[age]" of services alleged in the TAC.  In any event, that grievance was resolved in Plaintiff's favor to end the ostensibly retaliatory conduct of being falsely identified as a gang member.  (*See* TAC, Ex. D).  Similarly, Plaintiff's federal complaint was filed nearly one year prior to the retaliatory conduct he alleges, and the operative complaint was, of necessity, filed after the retaliatory conduct it alleges.  (Dkt.

#2).  Accordingly, Plaintiff has not alleged retaliation under Section 1983, and the Court dismisses these claims.[10]

### 6.    Plaintiff Has Failed to Allege Municipal Liability

Because Plaintiff has failed to plead an underlying constitutional violation against any of the individual Defendants, he has necessarily failed to plead a claim for municipal liability under *Monell*.  *See City of Los Angeles* v. *Heller*, 475 U.S. 796, 799 (1986) ("[The City agencies] were sued only because they were thought legally responsible for [the officer's] actions; if the latter inflicted no constitutional injury on respondent, it is inconceivable that petitioners could be liable to respondent."); *see also Segal* v. *City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").  Accordingly, the Court dismisses the claims against the City.

### 7.    The Court Will Not Exercise Supplemental Jurisdiction over Any State-Law Claims

The Court understands Plaintiff to bring only federal claims in this lawsuit; Defendants believe, to the contrary, that Plaintiff also brings state-law claims for negligence and medical malpractice, and requests that this Court decline to exercise supplemental jurisdiction over them.   (Def. Br. 14-15).

---

[10]    Because Plaintiff has failed to state a Section 1983 claim against any of the individual Defendants, the Court does not proceed to address Defendants' arguments regarding the applicability of qualified immunity.  (*See* Def. Br. 12).  *See generally Rivas-Villegas* v. *Cortesluna*, 142 S. Ct. 4, 7 (2021) (discussing principles of qualified immunity).

A district court may decline to exercise supplemental jurisdiction over state-law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 n.7 (1988). Having dismissed the federal claims over which the Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction over any state-law claims Plaintiff may be asserting. *See Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.'" (quoting *City of Chicago* v. *Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997))).

### 8. The Court Will Not Grant Plaintiff Leave to Amend

The one remaining issue concerns amendment of Plaintiff's pleadings. "Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court 'should freely give leave [to amend] when justice so requires.'" *Gorman* v. *Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (quoting Fed. R. Civ. P. 15(a)(2)). Consistent with this liberal amendment policy, "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Id.* (quoting *Block* v. *First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). The Second Circuit has explained that, "[a] *pro se* complaint

31

should not be dismissed without the Court's granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Grullon* v. *City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (internal quotation marks and alterations omitted) (quoting *Chavis* v. *Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)).  That being said, "it remains 'proper to deny leave to replead where … amendment would be futile.'" *Gorman*, 2014 WL 7404071, at *2 (quoting *Hunt* v. *All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998)).

Plaintiff amended his pleadings three times after a court conference during which his pleading deficiencies were discussed at length.  (Dkt. #22). *See Foman* v. *Davis*, 371 U.S. 178, 182 (1962) (holding that "repeated failure to cure deficiencies by amendments previously allowed" is a basis to deny leave to amend).  He has not sought leave to amend his pleadings further in response to Defendants' motion — indeed, he has not responded to Defendants' motion at all.  Even if Plaintiff had requested leave, the Court concludes that any amendment would be inappropriate on this record and futile.  Whether cast as discrete violations or incidents of retaliation, the incidents described by Plaintiff do not suffice to support a claim under Section 1983.   Accordingly, the Court declines to grant Plaintiff leave to amend.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss the federal claims in this case with prejudice. The Court declines to exercise jurisdiction over any state-law claims that Plaintiff intended to bring in the TAC. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

The Clerk of Court is further directed to mail a copy of this Opinion and Order to Plaintiff at the following address:

> Randy Swinson,
> B&C No. 3492103407
> NYSID No. 06288329Z
> George R. Vierno Center (GRVC)
> 09-09 Hazen Street
> East Elmhurst, New York 11370.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Opinion and Order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated:     January 14, 2022
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge